# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHEILA M. KYLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-809-PJC |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Sheila M. Kyle ("Kyle"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for disability insurance benefits and disabled

widow's benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of

Appeals. Kyle appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the

Commissioner erred because the ALJ incorrectly determined that Kyle was not disabled. For the

reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's

decision.

### Claimant's Background

Kyle was 56 years old at the time of the hearing before the ALJ on April 21, 2009. (R.

26). She had a high school education. *Id*. Kyle testified that she quit working after 13 years as a

cashier because she was no longer able to lift the approximate 25 pounds that her job required.

(R. 24-27). Her limitations were residual from carpal tunnel surgery and hysterectomy surgery.

(R. 27-28).

Kyle had undergone carpal tunnel surgery on her left wrist. (R. 29). After her surgery, she continued to experience pain. *Id*. She said that she had needed surgery on her right wrist, but that she was unable to afford it because her hours at work had been reduced and she had lost her insurance. (R. 29). Her hands ached if she used them longer than 15 minutes at a time. (R. 29-30). She was unable to lift anything heavier than a pot of coffee, which she would lift with both hands. (R. 30-31).

Kyle endured chronic abdominal pain following a hysterectomy. (R. 27-28). Kyle's pain was intermittent and varied in intensity. *Id.* She said that her abdomen hurt if she sat, stood, or walked longer than 30 minutes at a time. (R. 30-31). She took Lortab three times a day. (R. 28). In an effort to treat her pain, she underwent four subsequent surgeries to repair abdominal adhesions. *Id*. She had last seen a surgeon in 2005 who informed her that he could not do anything further to treat her. *Id.*

Kyle testified that she was able to care for her pets, watch television, read books, and socialize with her family and her friends. (R. 32-33). Kyle did not do any cooking. (R. 34). Her family helped her with housework, but she made the bed every day, and she occasionally dusted. (R. 34). Her brother did her yard work. *Id.* She purchased half-gallons of milk because they were easier to lift. (R. 31). Kyle was afraid to drive her car after she had taken her pain medication. (R. 28, 33). She rested on her couch daily for a few hours. (R. 32). Amitriptyline helped Kyle sleep through the night. *Id*.

Gary Decker, M.D., evaluated Kyle on March 23, 1999, after a referral from C. David DeJarnett, D.O. (R. 262-64). Dr. Decker wrote that Kyle saw him for a surgical option for her abdominal pain. (R. 262). In reporting her medical history to Dr. Decker, Kyle said she had a

hysterectomy due to endometriosis and abdominal pain. *Id*. She reported that following her hysterectomy, she developed abdominal adhesions and underwent two laparoscopic surgeries. *Id*. She had increased pain following those surgeries. *Id*. Kyle reported that she had not done any heavy or regular work since her surgery. *Id*. Dr. Decker noted that Kyle was using "quite a bit of pain medication." *Id.* He wrote that Kyle spent her time on her couch doing almost nothing. *Id.* He told Kyle that he felt a third attempt to take down her abdominal adhesions would fail. *Id.* He informed her that there was a good chance that her problem would resolve itself. *Id*. He recommended that Kyle should start on an exercise program, that she should not smoke, and that she should maintain good nutrition. *Id.* Physical examination of Kyle was normal. *Id*.

Kyle presented to Dr. Decker on September 21, 1999, crying and complaining of recurrent pain in her left ovary area. (R. 260-61). She reported that her pain was severe and worse since her last appointment. *Id.* She wanted Dr. Decker to perform diagnostic laparoscopy and possible lysis of adhesions. (R. 260). Dr. Decker told her he wanted to order diagnostic examinations prior to considering performing a surgical procedure. *Id*.

When Dr. Decker saw Kyle on November 11, 1999, he informed her that results of diagnostic tests were normal. (R. 254-59). Kyle told Dr. Decker that she wished to proceed with a diagnostic laparoscopy, so he scheduled her for surgery on November 29, 1999. (R. 249-50, 254-59)*.* During her surgery, Dr. Decker released one adhesion in the region of Kyle's left lower pelvis. (R. 251-52). Kyle reported that she was doing better when Dr. Decker examined her on December 7, 1999. (R. 248). She reported on January 4, 2000 that she continued to do well and said that she was happy with the surgical results. (R. 246).

Dr. Decker examined Kyle on November 18, 2002, following an abnormal breast mammogram. (R. 241). Kyle told Dr. Decker that she had been doing well and that she had minimal abdominal discomfort since she had last seen him in 2000. *Id.* She said that she was taking antidepressants and was feeling great. *Id.* Pathology results of Kyle's breast biopsy were benign. (R. 236-45).

James F. Bischoff, M.D., of Eastern Oklahoma Orthopedic Center, examined Kyle on August 31, 2004 for tingling and numbness in her left hand, and tenderness in her left wrist. (R. 171). His examination revealed that Kyle had first dorsal compartment tendonitis and potential carpal tunnel syndrome in her left wrist. *Id*. He scheduled her for an EMG[1] and nerve conduction testing on September 1, 2004. *Id*. Test results showed mild median neuropathy in Kyle's left wrist and mild slowing of the left median sensory latency. (R. 162, 170).

On September 21, 2004, Dr. Bischoff performed an endoscopic left carpal release surgery, and surgical release of the first dorsal compartment on her left wrist. (R. 160-61). Kyle showed improvement at monthly post-surgery rechecks with Dr. Bischoff through January 2005. (R. 150-57, 164-69). In each of Dr. Bischoff's rechecks, he stated restrictions on Kyle's work activities, ranging from no use of her left hand on October 7, 2004, to an ability to participate in activities, but with a recommendation of no lifting more than five pounds on February 16, 2005. (R. 164-69). At each of these appointments, Dr. Bischoff also completed a form entitled "Work Status Report and Referral Form," and he stated Kyle's restrictions on this form. (R. 150-57). He noted chronic tendonitis on many of these forms as an additional diagnosis to the carpal tunnel syndrome diagnosis. *Id*.

---

[1] Electromyogram (EMG) is a graphic record of the contraction of a muscle as a result of electrical stimulation. Taber's Cyclopedic Medical Dictionary 618, 629 (17th ed. 1993).

Dr. DeJarnett examined Kyle on January 25, 2005 for symptoms related to congestion. (R. 200-01). Notes from the appointment indicate that review of Kyle's gastrointestinal system was normal. (R. 200).

Kyle presented to Dr. DeJarnett on February 23, 2005 and said that she had stiffness and pain in her lower back, and pain in her left lower groin area. (R. 198-99). The diagnosis is not legible, but it appears that the code might be 724.5,[2] which would correspond to backache, unspecified, vertebrogenic (pain) syndrome not otherwise specified. (R. 199).

Dr. Bischoff released Kyle from his care on March 30, 2005. (R. 163). He wrote that Kyle had "reached her maximum medical improvement and that she has 5% permanent partial impairment of her left hand." *Id*. His opinion was that Kyle could participate in activities, but he recommended "on a permanent basis no lifting more than five pounds with her left hand." *Id*.

At Kyle's appointments with Dr. DeJarnett on April 14, 2005 and May 18, 2005, she continued to report that she had abdominal pain. (R. 192-95). The list of Kyle's medications indicated that she was taking Paxil and hydrocodone. (R. 194). Dr. DeJarnett increased Kyle's dosage of Paxil. (R. 194-95). He ordered blood work for Kyle and referred her to Dr. Decker for surgical consultation. (R. 193, 195). Results of her blood work showed she had elevated lipids in her bloodstream, and Dr. DeJarnett prescribed Zocor. (R. 209-11).

When Dr. Decker evaluated Kyle on June 6, 2005, he wrote that Kyle was taking four pain pills a day for severe pain. (R. 175-76). He described his physical examination of Kyle as "fairly unremarkable," but with subjective pain. *Id*. Dr. Decker was reluctant to perform

---

[2] The International Classification of Diseases, 9th edition - Clinical Model coding system is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

diagnostic surgery because his examination did not reveal any specific findings. *Id*. Dr. Decker noted that Kyle's pain seemed worse following her earlier surgeries. *Id*. He ordered a CT scan of Kyle's abdomen. *Id*.

On July 11, 2005, Dr. Decker advised Kyle that he was unable to treat her further from a surgical standpoint, because the results of the June 13, 2005 CT scans were normal. (R. 173, 207, 228-30). Kyle saw Dr. DeJarnett on the same day, and he reiterated that Dr. Decker did not feel that surgery would help her based on the CT results. (R. 174).

Wesley A. Andrews, M.D., apparently in the same practice with Dr. DeJarnett, examined Kyle on August 31, 2005. (R. 189-90). She continued to report chronic abdominal pain. *Id*. Dr. Andrews discussed the possibility of Kyle undergoing pain management treatment. (R. 189). Kyle was using Lortab and Paxil. (R. 188). When Kyle saw Dr. Andrews on November 21, 2005, she told him she wanted to try Elavil for pain management. (R. 186-87). He gave her a prescription for Elavil and refilled her prescriptions for Lortab and Paxil. *Id*.

On July 17, 2006, William Blaine Price, D.O., apparently in the same practice with Dr. Andrews and Dr. DeJarnett, saw Kyle and included diagnoses of chronic abdominal pain and abdominal adhesions. (184-85). He refilled Kyle's prescriptions for Lortab and Paxil.

At an October 30, 2006 appointment with Dr. Price, Kyle was still having abdominal pain, but was not having to take as much pain medication. (182-83). Dr. Price diagnosed her with chronic abdominal pain and lumbago, and he provided a refill of Lortab. *Id.*

On April 20, 2007, Kyle presented for refill of her pain medications, and a note states that Kyle was "not having as much problems with stomach." (R. 180). Dr. Price continued the diagnosis of chronic abdominal pain and refilled Kyle's Lortab prescription. (R. 180-81).

On November 29, 2007, Dr. Price diagnosed Kyle with depression, insomnia, and chronic pain, and he refilled her prescriptions for Lortab, Amitriptyline, and Paxil. (178-79). On June 11, 2008, Dr. Price diagnosed Kyle with adhesions and chronic abdominal pain. (R. 222-23). On December 29, 2008, he diagnosed adhesions, insomnia, and depression, and he continued Kyle's Lortab, Amitriptyline, and Paxil prescriptions. (R. 225-26).

Agency consultant Seth Nodine, M.D., examined Kyle on February 19, 2008. (R. 214-20). Kyle reported that she had chronic pain in the left lower quadrant of her abdomen. (R. 214). Kyle said that her pain fluctuated, and that it varied in intensity from being achy to severe. *Id*. Pain medication helped Kyle's pain for a few hours before she had to take more. *Id*. Dr. Nodine reported that Kyle had significant relief after undergoing left carpel tunnel surgery, and reported that she did not have tingling, numbness, or pain. *Id*. Dr. Nodine noted that Kyle's past medical history included major depressive disorder and insomnia. *Id*. Kyle told him she had an approximate 20-year history of tobacco use. *Id*. Her current medications were listed as Paxil, Lortab, and Amitriptyline. *Id*.

On physical examination, Dr. Nodine found that Kyle had no discomfort or pain with deep palpation of her abdomen. (R. 216). Kyle's evaluated grip strength was 5/5 bilaterally. *Id*. His evaluation of Kyle's finger to thumb opposition and fine tactile manipulation showed she had normal strength. (R. 216, 219). He assessed that Kyle could manipulate small objects and that she could grasp a tool such as a hammer. (R. 219). He found normal range of motion in Kyle's wrists. (R. 216).

Dr. Nodine's assessment included major depressive disorder and insomnia. (R. 216). He also assessed the following regarding Kyle's abdominal pain and status post carpal tunnel surgery:

Abdominal pain secondary to adhesions with ongoing constant pain by description. She does not appear to be in pain today and her exam is benign. She has no pain with deep palpation today.

. . . .

[History of] left [carpal] tunnel syndrome with complete resolution of symptoms and negative exam today. [Kyle] states that she was placed on a permanent weight restriction but symptoms have completely resolved and I do not have documentation of this restriction.

*Id*.

## Procedural History

Kyle filed an application on July 18, 2007 for disabled widow's benefits, and on December 20, 2007 filed an application for disability insurance benefits under Titles II, 42 U.S.C. §§ 401 *et seq*. (R. 95-97). In these applications, Kyle alleged onset of disability as July 30, 2005. (R. 95). The applications were denied initially and on reconsideration. (R. 48-55, 57-62). A hearing before ALJ Deborah L. Rose was held April 21, 2009 in Tulsa, Oklahoma. (R. 20-39). By decision dated June 10, 2009, the ALJ found that Kyle was not disabled. (R. 13-19). On December 6, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[3]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

---

[3]Step One requires the claimant to establish that he is not engaged in substantial gainful
activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that
he has a medically severe impairment or combination of impairments that significantly limit his
ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in
substantial gainful activity (Step One) or if the claimant's impairment is not medically severe
(Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared
with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant
suffering from a listed impairment or impairments "medically equivalent" to a listed impairment
is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four,
where the claimant must establish that he does not retain the residual functional capacity
("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden
shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the
national economy which the claimant, taking into account his age, education, work experience,
and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability
benefits are denied if the Commissioner shows that the impairment which precluded the
performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Kyle met insured status requirements through September 30, 2010. (R. 15). Kyle also met the non-disability requirements for disabled widow's benefits, with her prescribed period ending June 30, 2012. *Id*. At Step One, the ALJ found that Kyle had not engaged in any substantial gainful activity since her alleged onset date of July 30, 2005. (R. 16). At Step Two, the ALJ found that Kyle had severe impairments of a history of prior abdominal surgeries with adhesions and history of left carpal tunnel surgery. *Id.* At Step Three, the ALJ found that Kyle's impairments did not meet any Listing. *Id*.

In her RFC determination, the ALJ found that Kyle had the RFC to perform a full range of light work. *Id*. At Step Four, the ALJ found that Kyle was capable of performing her past relevant work as a cashier. (R. 18). Therefore, the ALJ found that Kyle was not disabled pursuant to either of her applications. (R. 19).

## Review

While Kyle raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Kyle's treating physician. Because reversal is required based on this issue, the other issues Kyle raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial

evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even

if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to

deference and must be weighed using the appropriate factors set out in Section 404.1527.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific

reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion

completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating

physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to

examine the other medical reports to see if they outweigh the treating physician's report, not the

other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

The ALJ's discussion of Dr. Bischoff's evidence was quite limited. The ALJ first

discussed Dr. Nodine's examination and conclusions. (R. 18). She then discussed the opinions

of nonexamining consultants that Kyle did not have a severe impairment. (R. 18, 42, 45). Only

after discussing that opinion evidence, did the ALJ address Dr. Bischoff's opinion evidence with

this one sentence:

> [Kyle's] surgeon, James F. Bischoff, M.D. put [Kyle] on a permanent lifting
> restriction of 5 pounds for her left hand (Exhibit 1F), but that is not supported by
> any objective findings of neurological abnormalities after full recovery from
> surgery.

(R. 18). The ALJ then stated that Dr. Nodine's "negative findings" contradicted Dr. Bischoff's

restriction on lifting. *Id.*

The ALJ's discussion and reasoning is not sufficient to explain her full rejection of Dr.

Bischoff's opinion that Kyle should not lift more than five pounds on a permanent basis. First,

the ALJ's one sentence implies that the only thing that would have justified a permanent lifting

restriction was "objective findings of neurological abnormalities." There is no such requirement

in Social Security disability law. *See Garcia v. Barnhart*, 188 Fed. Appx. 760, 764 (10th Cir.

2006) (unpublished) (ALJ's citation to the claimant's normal sensory function in his foot did not

undermine the opinion evidence of the treating physician based on disc herniation). Dr. Bischoff,

as Kyle's treating surgeon, was in a better position to judge what Kyle's permanent restrictions

were following successful carpal tunnel surgery than was the ALJ. *See Cagle v. Astrue*, 266 Fed.

Appx. 788, 794 (10th Cir. 2008) (unpublished), *quoting McGoffin v. Barnhart*, 288 F.3d 1248,

1252 (10th Cir. 2002) (ALJ may reject a treating physician opinion outright only on the basis of

contradictory medical evidence and not due to speculation).

Second, the lack of objective evidence supporting a treating physician opinion is a

legitimate basis for rejecting or discounting the opinion. *White v. Barnhart*, 287 F.3d 903, 907

(10th Cir. 2001). In Kyle's case, Dr. Bischoff had the objective medical evidence of having

performed the surgery for carpal tunnel release on which to base his opinion. His treatment of

Kyle through the surgery and recovery gave him an objective basis for a professional opinion that

a patient, such as Kyle, having had this kind of surgery, should limit the amount of lifting she

does with her hand. (R. 150-57, 160-61, 163-68). *See Castro v. Astrue*, 2011 WL 3500995 *8-

10 (E.D. Calif.) (surgeon's opinion regarding lifting restrictions after carpal tunnel surgery was

based on objective medical evidence and therefore ALJ erred in rejecting it because it was "not

consistent with the objective medical evidence"). Therefore, to the extent that the ALJ based her

rejection of Dr. Bischoff's opinion on a lack of objective evidence, the Court rejects that finding

as not supported by substantial evidence.

While the ALJ is not required to discuss each factor of Section 404.1527 in weighing the

opinion of a treating physician, here the ALJ's discussion was impermissibly brief and did not

show that she considered the factors. In addition to her implied requirement that there needed to

be neurological abnormalities after the surgery in order to justify the restriction on lifting, she

also found the lifting restriction to be contradicted by "negative findings" of Dr. Nodine, the

examining consultant.  As was true of the lack of neurological abnormalities, the undersigned

rejects the ALJ's speculative assumption that lack of pain or restricted range of motion following

successful carpal tunnel surgery means that any restrictions that the surgeon assigned on a

permanent basis are invalid.  Additionally, the ALJ did sufficiently explain how she weighed the

opinion evidence of Dr. Bischoff, as the treating physician, and Dr. Nodine, as the examining

physician.  *See Garcia*, 188 Fed. Appx. at 764-65 (precedence is given to treating physician

opinion unless consulting opinion "demonstrably outweighs" the former).  The ALJ should

explicitly consider all of the factors in the cited regulation when weighing the opinion evidence

of Dr. Bischoff on remand.  *See Andersen v. Astrue*, 319 Fed. Appx. 712, 721-22 (10th Cir.

2009) (unpublished) (while ALJ need not discuss all factors, ALJ must make clear that she

considered them).

Because the errors of the ALJ related to the opinion evidence require reversal, the

undersigned does not address the remaining contentions of Kyle.  On remand, the Commissioner

should ensure that any new decision sufficiently addresses all issues raised by Kyle.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.

*Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to

assure that the correct legal standards are invoked in reaching a decision based on the facts of the

case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838

F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the

Commissioner denying disability benefits to Claimant for further proceedings consistent with this

Order.

Dated this 16th day of March, 2012.

Paul J. Cleary
United States Magistrate Judge